AMY J. BRICKER (State Bar No. 227073)
SUSANNAH T. FRENCH (State Bar No. 168317)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:    (415) 552-7272
Facsimile:    (415) 552-5816
French@smwlaw.com
Bricker@smwlaw.com

Attorneys for Plaintiff
Mountain Area Preservation Foundation

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| MOUNTAIN AREA PRESERVATION FOUNDATION,<br><br>    Plaintiff,<br><br>    v.<br><br>TAHOE REGIONAL PLANNING AGENCY,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>**[Violations of the Tahoe Regional Planning Compact, Regional Plan, and Related Regulations]** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Plaintiff, Mountain Area Preservation Foundation, by and through its undersigned attorneys, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**NATURE OF THE ACTION**

1.     This action challenges the approval by the Tahoe Regional Planning Agency ("TRPA") of the Phase 2 Housing Amendments ("Amendments" or "Project") in violation of the Tahoe Regional Planning Bi-State Compact ("Compact"), the TRPA Regional Plan, and TRPA regulations.

2.     Mountain Area Preservation ("MAP") is a 36-year-old grassroots environmental nonprofit organization. In addition to advocating for open space preservation, natural resource protection, environmental justice and smart land use planning, MAP is committed to housing that supports the community workforce, and its advocacy has helped to bring over 700 workforce housing units to the North Lake Tahoe area. MAP opposes TRPA's rushed approval of a Project that eliminates affordable housing protections while allowing high-density development based on a cursory checklist that fails to address or mitigate the Project's impacts on the environment, natural and scenic resources, public safety, and community character of the Tahoe Basin.

3.     TRPA's authority and duties are set forth in the Compact, a Congressionally approved agreement between California and Nevada. Under the Compact, TRPA must adopt and implement a Regional Plan and code provisions that ensure that new development will not exceed or impede environmental threshold carrying capacities ("thresholds") adopted to protect water quality, air quality, scenic views and other unique Tahoe resources. TRPA must also prepare and circulate for public review a detailed environmental impact statement ("EIS") when acting on matters that may have significant environmental consequences.

4.     The Regional Plan and TRPA Code of Ordinances ("TRPA Code") are required to protect the Tahoe Basin from excessive development, reduce significant

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

impacts from new growth, and ensure that environmental thresholds are achieved. Prior to TRPA's adoption of the Phase 2 Housing Amendments, the Regional Plan and TRPA Code included rigorous limitations on building height, density and lot coverage to protect the region's unique environmental resources. These limitations were developed after extensive public debate as part of the 2012 Regional Plan Update, the last comprehensive Regional Plan amendment TRPA adopted. The Regional Plan also includes goals and policies to ensure development of affordable housing.

5.     The Amendments, adopted by the TRPA Governing Board on December 13, 2023, reduce the protections in the Regional Plan and TRPA Code by increasing height, density, and coverage limits, and reducing parking requirements, in Town Centers, the Regional Center and the High-Density Tourist District ("Centers"), as well as various areas zoned multi-family housing ("Impacted Areas"). Most of these areas are on or near the Lake Tahoe shoreline and within classified Very High Fire Hazard Severity Zones ("VHFHSZ").

6.     The Amendments apply to specified development under TRPA's residential bonus unit program that includes deed-restricted housing ("Designated Development"). The Amendments were promoted by TRPA as necessary to increase "affordable" housing in the Basin. But the Amendments are not limited to housing and, in fact, eliminate a key Code provision requiring construction of "affordable" units. The high-intensity development standards will apply to commercial development, like retail, office, and restaurants, in a mixed-use development where commercial uses are up to half the square footage. Accessory dwelling units ("ADUs"), which are exempted in some circumstances from affordable or "achievable" requirements, are also subject to the higher coverage maximums. And the Amendments eliminate the prior requirement that half of the bonus units be for "affordable" housing, the type most urgently needed in the Basin. Under the Amendments, up to 25 percent of the bonus housing units remaining as of December 24, 2018 can be developed as "achievable" housing, a category with a local workforce

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

requirement, but no income or asset cap. The remaining 75 percent may be developed as affordable *or* moderate-income housing. The Governing Board deleted the affordable housing requirement in the final minutes of the December 13, 2023 public hearing meeting with no public notice and no clear discussion of the issue.

7.     The Amendments are intended to accelerate high-density development within Impacted Areas. This will fundamentally change the character of these areas, pave the way for more development, significantly impact scenic views, and have other potentially significant impacts on water and air quality, transportation, and emergency evacuation. Moreover, the Amendments are merely "Phase 2" of a larger three-phase plan. TRPA staff indicated that Phase 3 will revisit long-standing systems like the growth management and development rights system, fees and permitting systems.

8.     Rather than preparing an environmental impact statement ("EIS") to fully and comprehensively evaluate the impacts of the Amendments, together with planned Phase 3 amendments, TRPA rushed through approval of the Amendments based on an Initial Environmental Checklist ("IEC").

9.     The IEC is tiered from the 2012 Regional Plan Update (RPU) Environmental Impact Statement ("RPU EIS"). However, TRPA regulations allow tiering only where a project is *consistent with* the plan for which an earlier EIS was prepared. The Amendments are *not* consistent with the 2012 RPU, but eliminate or weaken the height, coverage, and density requirements that TRPA adopted to minimize the impacts of new development and protect the Tahoe Basin. Moreover, Tahoe has faced expanded growth and deteriorating environmental conditions since 2012. TRPA was required to take a hard look at the environmental consequences of its action in light of current conditions and scientific knowledge, rather than approving higher-intensity development based on studies and reports from over a decade ago.

10.     Where TRPA prepares an EIS, it must provide public notice, circulate the document for public comment for 60 days, consult with relevant agencies, and consider

3

1  alternatives and mitigation measures to reduce impacts. This allows the staff and the

2  Governing Board time to carefully articulate the scope of the project, weigh public

3  comments and concerns, and consider alternatives and mitigation to reduce impacts.

4       11.    Here, however, TRPA undertook no formal comment period or consultation.

5  Instead, TRPA approved the Amendments after a rushed environmental review process,

6  during which the scope of amendments was repeatedly modified. Some of the changes

7  scaled back on the proposed amendments or purported to do so; others—such as the last-

8  minute elimination of requirements for "affordable" housing—undermined their stated

9  goals. The shifting proposals and changing environmental review in the two months

10 between the release of the IEC in October and the Governing Board approval on December

11 13, 2023, left the public scrambling to understand what new standards TRPA was

12 proposing and how they would be implemented. In particular, the deletion of affordable

13 housing requirements and other significant changes were adopted in the final minutes of

14 the December 13, 2023, Governing Board meeting, with no public notice. After the

15 Amendments were approved, TRPA added to the confusion by posting an erroneous

16 version of the Amendments adopted on its website, which made it difficult for the public to

17 discern what changes the Governing Board actually approved or their environmental and

18 economic consequences for weeks after their approval.

19      12.    Moreover, the cursory IEC "checklist" provided little information about how

20 the proposed amendments would impact development on the ground or their

21 environmental consequences. It also contained no analysis of mitigation or alternatives to

22 reduce the Amendments' impacts on scenic views, water quality, air quality, or

23 transportation or address concerns about how high-density development would impact

24 emergency evacuation. TRPA admitted that there would be impacts related to the effects of

25 shading from taller buildings by adding a requirement that these developments conduct a

26 future shade analysis. But the IEC does not include a shade analysis or disclose shading

27 impacts to the public, and it fails to demonstrate that a requirement that taller buildings

28

4

"minimize shade" on adjacent roads and buildings would fully mitigate these impacts. While the public urged TRPA to consider less environmentally damaging alternatives—like requiring new development to provide workforce housing, limiting short-term rentals, and supporting the development of real affordable workforce housing solutions—these options were never even considered.

13.     TRPA's 11th-hour elimination of affordable housing requirements was contrary to long-standing Compact and Regional Plan policies, arbitrary and capricious, and violated TRPA regulations designed to ensure transparency and public review.

14.     The findings issued by TRPA in approving the Phase 2 Housing Amendments also fail to comply with the TRPA Compact and TRPA regulations and cannot be upheld. The Amendments focus and accelerate new development in areas near or directly adjacent to the Lake, while increasing height, density, and coverage limits. TRPA's conclusory determinations that the Amendments "achieve and maintain" the thresholds and "could not" have significant environmental impacts lack evidentiary support and are contrary to the record.

## JURISDICTION AND VENUE

15.     This action arises under the Tahoe Regional Planning Compact, Public Law No. 96-551, 94 Statute 3233 (1980), Cal. Gov. Code § 66801)[1] and under the Compact Clause of the United States Constitution, Article 1, section 10, clause 3. Article VI(j) of the Compact and 28 U.S.C. § 1331 (federal question) confer jurisdiction in this Court. *See also League to Save Lake Tahoe v. Tahoe Regional Planning Agency* (9th Cir. 1974) 507 F.2d

---

[1] Pursuant to Eastern District of California Local Rule 133(i)(3)(i), a copy of Compact is attached as Exhibit A. Because other uncodified authority, such as the TRPA Code, TRPA Rules, and Regional Plan, are voluminous, they are not attached to this complaint. MAP anticipates that these authorities will be provided prior to completion of briefing as part of the record for this action or pursuant to a request for judicial notice but will provide copies earlier if requested by the Court.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

517, 522-25. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201-02 and Rule 57 of the Federal Rules of Civil Procedure.

16.     Plaintiff brings each and every claim under the Compact as both a federal law claim and a state law claim under the Compact pursuant to Article VI(j) of the Compact.

17.     Venue is proper in this Court pursuant to Article VI(j)(2)(B) of the Compact, because the action challenges a TRPA approval that "does not involve a specific parcel of land (such as an action challenging an ordinance of the agency)" and this Court has jurisdiction within the region. Further, venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

18.     Pursuant to the Eastern District of California Local Rule 120(d), intradistrict venue is proper in Sacramento, California because Plaintiff's claims arise within Placer and El Dorado Counties.

19.     Pursuant to 28 U.S.C. § 2201 et seq., Plaintiff seeks a declaration of rights under the laws of the United States and California. There exists now between the parties an actual, justiciable controversy in which Plaintiff is entitled to have a declaration of its rights and of Defendant TRPA's obligations, and further relief, because of the facts and circumstances hereinafter set out.

20.     This action was timely filed within 60 days of TRPA's approval of the Project pursuant to Article VI(j)(4) of the Compact.

21.     MAP has no adequate remedy at law. No monetary damages or other legal remedy can adequately compensate MAP, its members, or the public for the harm caused by TRPA's actions. MAP and its members are adversely affected and aggrieved by TRPA's unlawful approval of the Amendments.

22.     MAP's members live and work in the Lake Tahoe Basin and use Tahoe's resources, public services, and recreational assets on a daily basis. Their interests are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1   therefore adversely affected by the Amendments. TRPA's failure to comply with

2   applicable law will result in irreparable harm to the environment and to MAP and its

3   members. The relief requested will fully redress these injuries.

4   **PARTIES**

5       23.    Plaintiff Mountain Area Preservation Foundation (doing business as

6   Mountain Area Preservation or "MAP") is a California nonprofit corporation whose

7   purpose is to maintain the quality of life and protect the environment of the Lake Tahoe

8   region and surrounding areas, including the Tahoe Basin. MAP is an ardent advocate of

9   workforce housing with a proven track record of working collaboratively with non-profit

10  partners, local jurisdictions, and developers to get workforce housing units built. The

11  members of MAP seek responsible growth and affordable workforce housing that is

12  consistent with maintaining the open space, natural resources, viewsheds, and the unique

13  character of the Sierra region, including in the Tahoe Basin.

14      24.    Members of MAP are residents of the Lake Tahoe Basin. Members of MAP

15  use and enjoy the natural and scenic resources of Lake Tahoe and the surrounding regions,

16  including the areas directly affected by the Amendments. Members of MAP also use and

17  enjoy the recreation opportunities offered throughout the Tahoe Basin, including in or

18  adjacent to these areas. Members of MAP use and enjoy these areas for a variety of

19  purposes, including scientific study, hiking, cycling, photography, sightseeing, wildlife

20  observation, swimming, sailing, kayaking, canoeing, and fishing and intend to continue to

21  do so on an ongoing basis in the future. MAP's members derive recreational, spiritual,

22  professional, aesthetic, educational, and other benefits and enjoyment from these activities.

23  MAP and its members also have an interest in securing affordable and workforce housing

24  in the Tahoe Basin and some of its members could qualify for such housing.

25      25.    MAP and its members have a procedural interest in influencing the

26  management of Lake Tahoe through participation in any modifications to the Regional

27  Plan and implementing ordinances, as prescribed by the Compact, and in the development

28
                                        7

1  of comprehensive environmental analyses as required by the Compact and TRPA

2  regulations.

3      26.      The interests that MAP seeks to further in this action are within the purposes

4  and goals of the organization. MAP and its members have a direct and beneficial interest in

5  TRPA's compliance with the Compact and related ordinances and regulations. These

6  interests are directly and adversely affected by TRPA's approval of the Amendments,

7  which approval violates provisions of law as set forth in this complaint and which would

8  cause substantial and irreparable harm to the natural environment and to MAP members.

9  For example, the Amendments reduce requirements for affordable housing and, by

10  allowing higher-density development in Centers and multi-family zones, will lead to

11  increased adverse visual and scenic impacts, air and water pollution, and traffic. TRPA's

12  failure to comply with the Compact and TRPA regulations has also injured MAP and its

13  members by depriving them of information to which they are entitled, including

14  information pertaining to the Amendments' impacts on environmental resources in the

15  planning area, reasonable alternatives to the proposed action, and mitigation to reduce

16  adverse environmental impacts; by depriving them from a meaningful opportunity to

17  comment on the missing information; and by denying them the procedural safeguards set

18  forth in the Compact and TRPA regulations.

19      27.      The maintenance and prosecution of this action will confer a substantial

20  benefit on the public by protecting the public from the environmental and other harms

21  alleged herein and by ensuring that amendments to the Regional Plan and TRPA Code are

22  undertaken only after appropriate analysis and legally mandated public process. MAP is an

23  aggrieved person with standing to sue under Article VI(j)(3) of the Compact because it

24  appeared through authorized representatives and in writing before TRPA in connection

25  with hearings regarding the challenged TRPA actions and submitted comments to TRPA

26  objecting to and commenting on the Amendments and the IEC.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

28.     MAP's injuries will be redressed by the relief sought herein because the Amendments would be declared unlawful and ordered set aside and a new environmental analysis of the Amendments would be conducted that should result in a project that eliminates or significantly reduces environmental impacts, adopts adequate mitigation measures, is consistent with the Regional Plan and Compact, achieves and maintains the thresholds, and protects affordable housing. This relief would improve future opportunities for MAP's members who live and work in the Lake Tahoe region and enjoy the scenic and environmental resources of the region, including the Impacted Areas.

29.     MAP has no adequate remedy at law to address any of the foregoing injuries to their interests.

30.     Defendant Tahoe Regional Planning Agency ("TRPA") was created and exists as a legal entity pursuant to Article III(a) of the Compact. The Compact grants TRPA powers and responsibilities for land use planning and environmental protection in the Lake Tahoe region. TRPA's Governing Board is comprised of a seven-member California delegation; a seven-member Nevada delegation; and one non-voting member appointed by the President of the United States. Compact, Art. III(a)(1), (2); Art. X(d)(3). TRPA is required to establish environmental threshold carrying capacities for the region and to adopt and amend a regional plan, implemented through ordinances, rules, and regulations, that achieves and maintains these thresholds and conforms to the Compact. Art. V(b)&(c); Art. VI(a). TRPA is also responsible for adopting and amending regulations, including the TRPA Code, that conform to and effectuate the policies of the Regional Plan and the Compact. TRPA is required to prepare and consider a detailed environmental impact statement when acting on matters that may have a significant effect on the environment. Article VII(a); TRPA Code Section 3.7. The Governing Board has the authority to appoint staff to execute the powers and functions provided for under the Compact. Art. IV(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1

2

**FACTUAL AND LEGAL BACKGROUND**

**LAKE TAHOE AND THE TAHOE REGIONAL PLANNING AGENCY**

3   31.   As the United States Supreme Court confirmed, "All agree that Lake Tahoe

4   is 'uniquely beautiful,' that President Clinton was right to call it a 'national treasure that

5   must be protected and preserved,' and that Mark Twain aptly described the clarity of its

6   waters as 'not merely transparent, but dazzlingly, brilliantly so.'" *Tahoe-Sierra*

7   *Preservation Council, Inc. v. Tahoe Regional Planning Agency* 535 U.S. 302, 307 (2002)

8   (internal citations omitted).

9   32.   Responding to development threatening the Tahoe Basin, in 1969 Congress

10   approved a bi-state Compact between California and Nevada, which "set goals for the

11   protection and preservation of the lake." *Id*. at 309. The Compact established TRPA and

12   tasked that agency with adopting regulations to conserve the 501 square-mile Tahoe Basin.

13   *Id*. In 1980, Congress approved a comprehensive amendment to the Compact, greatly

14   enhancing TRPA's authority to protect the Lake. P.L. 96-551, December 19, 1980, 94 Stat.

15   3233. The Compact, as amended, is adopted as California law in Government Code section

16   66801.

17   33.   The Compact requires TRPA to establish regional environmental threshold

18   carrying capacities, which it defines as:

19

20

21

22

> an environmental standard necessary to maintain a significant scenic,
> recreational, educational, scientific or natural value of the region or to
> maintain public health and safety within the region. Such standards
> shall include but not be limited to standards for air quality, water
> quality, soil conservation, vegetation preservation and noise.

Compact, Art. II(i).

23   34.   The Compact also requires, at a minimum, that "[t]he regional plan shall

24   provide for attaining and maintaining Federal, State, or local air and water quality

25   standards, whichever are strictest, in the respective portions of the region for which the

26   standards are applicable." Compact, Art. V(d). However, the Compact allows TRPA to

27

28

10

1    adopt even more stringent standards "if it finds that such additional standards or control

2    measures are necessary to achieve the purposes of [the] compact." *Id.*

3         35.    Additionally, the Compact requires consideration of changing economic

4    conditions. In 2016, the Compact was amended to require that the Governing Board

5    "continuously review and maintain the regional plan and . . . ensure that the regional plan

6    reflects changing economic conditions and the economic effect of regulation on

7    commerce." Compact, Art. V.

8         36.    TRPA adopted its last comprehensive update of its Regional Plan in 2012.

9    The 2012 Regional Plan, and implementing amendments to the TRPA Code, included

10   limits for development, including height, density and coverage limitations. One of the key

11   changes between the draft and final 2012 Regional Plan was that, in response to public

12   concerns, the final Regional Plan removed provisions that would have allowed local Area

13   Plans to propose higher height and density limits adjacent to Centers. In 2021, TRPA

14   adopted an amendment to the Regional Plan to establish new goals and policies for annual

15   daily average vehicle miles traveled ("VMT").

16        37.    The Regional Plan includes policies and goals to achieve the development of

17   affordable housing. For example, Plan policies require that bonus units be given to

18   "promote affordable or government-assisted housing" for low and very low-income

19   households. Regional Plan, Policy HS-1.1; *see also* Goal HS-2 (moderate income housing

20   should be encouraged only "to the extent feasible, without compromising . . . affordable

21   housing incentive programs"); Policy HS-3.1 ("TRPA shall regularly review its policies

22   and regulations to remove identified barriers preventing the construction of necessary

23   affordable housing in the region"); Policy DP-3.1(B) (bonus units "shall be prioritized for

24   affordable housing projects and projects within community plans and Centers").

25        38.    The Regional Plan has a growth management system that limits development

26   in the Tahoe region. The TRPA Staff Report for the Amendments states that remaining

27   development potential available under the 2012 Regional Plan includes approximately

28
                                           11
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

3,525 residential units, approximately 946 of which are reserved as "residential bonus units." Prior to the Amendments, the TRPA Code required that half of these units be constructed as "affordable" housing.

39.     Prior to approving any project, TRPA must find that the project is consistent with and will not adversely affect implementation of the Regional Plan and will not cause the environmental threshold carrying capacities to be exceeded. TRPA Code Section 4.4.1.

40.     All required TRPA findings must be supported by substantial evidence in the record and must "be accompanied by a brief statement of the facts and rationales upon which they are based." TRPA Code Section 4.3.

## ENVIRONMENTAL REVIEW REQUIREMENTS

41.     Under the Compact, TRPA must "[p]repare and consider a detailed environmental impact statement before deciding to approve or carry out any project" that may have a "significant effect on the environment." Compact, Art.VII(a). In preparing an EIS, TRPA is required to use "a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking." *Id.* The Compact requires that an EIS consider the project's significant environmental impacts, set forth alternatives and mitigation to reduce these impacts, and adopt findings that all feasible mitigation has been adopted. Compact, Art. VII(a)(2) & (d). TRPA must also consult with relevant public agencies and provide a minimum 60-day public comment period on the EIS. *Id.*, Art.VII(b); TRPA Code Section 3.7.1.D.

42.     TRPA has identified certain minor projects, like single-family home construction, that are typically exempt from the EIS requirements. Where a project is not exempt, TRPA may prepare an Initial Environmental Checklist to determine whether an EIS is required. After preparing an IEC, TRPA may approve a project based on a "finding of no significant effect" or "FONSE" only where it finds that the project "could not have a significant effect on the environment." TRPA Code Section 3.3.2(A); TRPA Rules of

12

Procedure ("TRPA Rules") Section 6.6. Otherwise, it must prepare an EIS or a "mitigated finding of no significant effect" which identifies mitigation TRPA will implement to reduce potential impacts. TRPA Code Section 3.3.2.(B)&(C).

43.     If TRPA "determines the IEC will not provide sufficient information" to make the required findings, it can also prepare an Environmental Assessment ("EA"). TRPA Code Section 3.4. An EA requires a more detailed discussion of the project impacts, as well as a consideration of mitigation and alternatives. TRPA Code Section 3.4.1; TRPA Rules Section 6.5.2.

44.     TRPA rules provide that tiering can be used to incorporate matters covered in "broader EISs," but explicitly limit tiering "to situations where a later project or matter *is consistent with* a program, plan, policy, or ordinance for which an EIS was prepared." TRPA Rules Section 6.12 (emphasis added).

45.     TRPA rules also require preparation of a supplemental EIS where changes in a project or the circumstances in which it is undertaken may result in new significant impacts not considered in a previous EIS. TRPA Rules Section 6.15.

### TRPA'S DUTY TO ACHIEVE AND MAINTAIN ITS ADOPTED ENVIRONMENTAL THRESHOLD CARRYING CAPACITIES

46.     The Compact requires that the Regional Plan "as implemented through agency ordinances, rules and regulations, achieves and maintains the adopted environmental threshold carrying capacities." Compact, Arts. I(b), V(c). Before approving any amendment to the Regional Plan or to the TRPA Code, TRPA must find that the amendment "achieves and maintains the thresholds." TRPA Code Sections 4.5 & 4.6. TRPA must also make specific findings, based on substantial evidence, demonstrating how the thresholds are being achieved and maintained. TRPA Code Sections 4.2 & 4.3.

47.     Where a threshold has not been met, new Regional Plan or Code amendments must do more than maintain the status quo. In such circumstances, TRPA must determine that the amendments will actually achieve and maintain the threshold.

13

1   *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 739 F.Supp.2d 1260, 1271-

2   72 (E.D. Cal. 2010), *aff'd in part, vacated in part*, 469 Fed.Appx. 621 (9th Cir. 2012).

3                           **THE 2023 AMENDMENTS**

4        48.     The Phase 2 Housing Amendments modify standards for Designated

5   Development to allow higher, denser development and are intended to accelerate the

6   construction of housing (as well as commercial development) in Impacted Areas.

7        49.     The Amendments increase existing height, density and coverage limits

8   within Impacted Areas. In Centers, the Amendments increase maximum building height

9   from 56 (four stories) to 65 (typically five stories) feet, increase maximum coverage from

10  70 percent to *no maximum*, and increase maximum density from 25 units/acre to *no*

11  *maximum*. In areas zoned for multi-family housing, the Amendments increase maximum

12  building height depending on the roof pitch, increase maximum coverage from 30 percent

13  to 70 percent, and increase maximum density from 15 units/acre to *no maximum.* One

14  condition of increased coverage outside Centers is that runoff must be treated by a

15  stormwater collection and treatment system if a system is available for the area. The

16  Amendments also reduce parking requirements in the Impacted Areas.

17       50.     These changes were proposed to apply to deed-restricted affordable,

18  moderate or achievable housing, and associated mixed-use development with up to half

19  commercial uses, as well as certain ADUs (for coverage increases).

20       51.     The Amendments are designed to preempt local regulatory authority.

21  Pursuant to the Compact, while TRPA is authorized to adopt "minimum" environmental

22  and land use standards, any "political subdivision or public agency may adopt and enforce

23  an equal or higher requirement applicable to the same subject of regulation in its territory."

24  Compact, Art. VI(a). The TRPA Code accordingly generally allows local plans to adopt

25  "equal or superior measures" to achieve thresholds. TRPA Code 12.6.3. The 2012

26  Regional Plan update gave local jurisdictions flexibility to develop area plans that

27  implemented Regional Plan policies and most of the Region's area plans have adopted

28                                      14

their own height, density, and parking standards. The Amendments, however, provide that the new higher-intensity standards supersede these local standards. Local jurisdictions cannot adopt non-conforming standards, such as lower density or height maximums, without demonstrating that the restrictions are at least as effective economically in facilitating the construction of designated housing.

52.     TRPA presented drafts of the Phase 2 Housing Amendments at public events in the summer and fall of 2023 and hosted a webinar on September 19, 2023. In October 2023, TRPA posted the IEC on its website. In response to public concerns and questions, the proposal and IEC were modified in November and the revisions were presented to the TRPA Advisory Planning Commission in a November 1, 2023 Staff Report. On November 8, 2023 the Planning Commission recommended adoption of the amendments. On November 15, 2023, the Regional Plan Committee also recommended adoption of the amendments with some changes, clarifications, and additional information. These changes and clarifications addressed a number of contentious public issues regarding implementation, public safety and evacuation, the definition of "achievable" housing, building size and compatibility, deed restriction enforcement, and stormwater management. The amendments, as modified, were presented to the Governing Board in a December 6, 2023 Staff Report.

53.     The Governing Board held a public hearing on the proposed amendments on December 13, 2023. TRPA received over 200 public comment letters (totalling over 650 pages) on the Amendments and numerous individuals and groups, including representatives of MAP and Sierra Club, expressed concern about TRPA's plan to accelerate high-density housing throughout the Basin, and weaken long-time height, density and coverage limits in the Regional Plan, based on nothing more than an environmental checklist.

54.     At the end of the meeting, the Governing Board proposed three 11th-hour modifications to the proposals, none of which were included or described in the agenda

15

packet for the meeting. One scaled back their scope by eliminating "transition zones" from the Impacted Areas. The second eliminated alternative provisions for stormwater treatment in multi-family zones. Board members suggested that both of these changes would be revisited as part of Phase 3, together with other issues such as the allocation and potential expansion of bonus units and reconsideration of boundaries for multi-family and bonus areas and stormwater treatment service areas.

55.     The third change, adopted by the Board in the final minutes of the meeting, modified how TRPA assigns bonus units. The existing Code Section 52.3.1 required that half of the bonus units TRPA approved be for affordable housing, with the remaining half for moderate or achievable housing. Housing that is "affordable" is available to households with incomes not in excess of 80 percent of the county median. For "moderate" housing, the cut off is 120 percent of median income. TRPA Code Section 90.2 (definitions). In response to widespread objections that "achievable" housing had no income cap, and thus did not ensure low-income housing at all, the Board modified Section 52.3.1. to cap "achievable" housing to 25 percent of the bonus units, or up to 281 units. In doing so, however, TRPA also eliminated the requirement that half (or any) of the units be "affordable." Instead, under the Amendments, TRPA can approve 75 percent of the bonus units (or up to 843 units) as either affordable *or* moderate-income housing.

56.     At the end of the December 13, 2023 meeting, the Governing Board approved the Amendments to the Regional Plan and TRPA Code with the 11th-hour modifications. The Board's approvals included findings that the Amendments "could not have a significant effect on the environment," would be consistent with the Regional Plan and not adversely affect its implementation, would not cause the environmental threshold carrying capacities to be exceeded, and would "achieve and maintain" the thresholds. The approvals include the adoption of Ordinance 2023-07, amending the TRPA Code; Ordinance 2023-08, amending the TRPA Regional Plan Goals and Policies; and the adoption of Environmental Findings and Finding of No Significant Effect (FONSE). The

16

term "Amendments" or "Project" in this complaint include the Amendments and all Governing Board approvals related to the Phase 2 Housing Amendments on December 13, 2023.

57.     Ordinance 2023-07 does not identify the text of the adopted TRPA Code amendments, but merely references "Attachment B." As of late January 2024, the TRPA webpage that identifies "2023 Code Amendments" [https://www.trpa.gov/regional-plan/code-amendments/] included an erroneous and outdated version of the Amendments to Ordinance 2023-07 that did not include the Governing Board's last-minute modifications. Accordingly, members of the public looking at the official website and seeking to understand the scope and impact of the adopted Amendments would not have an accurate understanding about what changes the Board actually adopted. The correct version of the Amendments was not posted on this webpage until January 31, 2024.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (TRPA FAILED TO COMPLY WITH THE COMPACT, THE REGIONAL PLAN AND RELATED REGULATIONS IN ADOPTING THE AMENDMENTS)

58.     MAP hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 57 herein.

59.     TRPA's approvals of the Amendments and related findings were arbitrary and capricious, lacking in substantial evidentiary support, and in violation of the Compact, the Regional Plan, and TRPA regulations, and fail to set forth the facts and rationales upon which they are based.

### TRPA FAILED TO COMPLY WITH REQUIREMENTS FOR ENVIRONMENTAL REVIEW AND FINDINGS

60.     TRPA violated the Compact and the TRPA Code by approving the Amendments based on an Initial Environmental Checklist. The IEC tiers off of the 2012 RPU EIS. However, TRPA regulations provide that "[t]iering is limited to situations where a later project or matter *is consistent with* a program, plan, policy, or ordinance for which

17

1    an EIS was prepared." TRPA Rules Section 6.12 (emphasis added). The Amendments are

2    not consistent with the 2012 RPU, but rather modify the 2012 RPU by increasing

3    coverage, height, and density limits and decreasing parking requirements, as well as

4    superseding local authority on these issues. Thus, tiering from the RPU EIS was improper.

5          61.    The IEC's analysis and conclusions were also inadequate and not based on

6    substantial evidence. The IEC's deficiencies include, but are not limited to, the following:

7                a.    The IEC project description and environmental baseline are

8    inadequate and unstable. The IEC fails to identify how the Amendments would change

9    development patterns because it does not analyze or identify existing development levels

10   on the ground, compare existing levels to the levels permitted under the Amendments, or

11   analyze the environmental impacts of the increased development intensity. The IEC

12   contains no inventory of the number of affected parcels, the size of the parcels, their

13   development status (vacant or developed), or adjoining land uses. The IEC also sent

14   conflicting signals to the public. For example, in response to the question of whether the

15   Amendments would "conflict with any land use plan," the IEC says "No"; the IEC does

16   not identify existing development standards in local regulations and plans that would

17   conflict with, and therefore be superseded by the Amendments, or analyze the impacts of

18   these changes. The IEC also fails to address how the Amendments would impact

19   development approvals prior to the time local jurisdictions can propose and adopt

20   alternative standards. Thus, the public could not discern the extent to which the

21   Amendments would modify existing standards in local plans or green-light pending

22   development. In addition, the IEC does not address changes to the Amendments made after

23   its preparation. Nor does the IEC address the Amendment's relationship to, or facilitation

24   of, the planned Phase 3 Housing Amendments, which TRPA has indicated are likely to

25   expand the areas subject to the higher intensity standards adopted in the Amendments, as

26   well as implement other development changes.

27

28
                                                    18

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

b.      The IEC improperly defers analysis of impacts, answering many of the questions in the checklist solely by asserting that impacts would be determined at the project level. Thus, the IEC does not meaningfully address numerous critical issues like soils, erosion, land coverage, air quality, greenhouse gas emissions, water quality, water discharge, water temperature, groundwater impacts, vegetation, biological resources, noise, light and glare, land use, scenic viewsheds and aesthetics. Moreover, the IEC fails to demonstrate that future development will be subject to detailed environmental review (like an EIS) or will require a public hearing. For example, TRPA Code Section 65.2.3 exempts all affordable, moderate, and achievable units from any transportation analysis or mitigation.

c.      The IEC's conclusion that the Amendments have no significant environmental impacts is not supported by substantial evidence. The IEC fails to evaluate and disclose potentially significant impacts on the Tahoe environment, including but not limited to the following: soil and erosion; Lake Tahoe water quality and clarity; traffic, parking and air quality; impacts to views and scenic resources; safety impacts from wildfire evacuation; and cumulative impacts on these resources from past and planned regional growth and development, including higher intensity development in and around the Impacted Areas for which these Amendments set the stage.

62.      In addition, TRPA violated the Compact and TRPA regulations by failing to prepare a supplemental EIS for the Amendments, despite substantial changes in the circumstances and underlying scientific data regarding the Tahoe Basin environment since the RPU EIS was approved in 2012. These changes will exacerbate the impacts of the accelerated and concentrated development the Amendments approve and include, but are not limited to:

a.      Local and regional and demographic changes, such as increases in second home usage from COVID-19, new project approvals, increased regional development, growth in short-term rentals and ADUs, and increased recreational use and

19

tourism, all of which have significant direct and cumulative impacts on the Tahoe Basin with regard to traffic, air quality and water quality, scenic views, and public safety and evacuation risks;

b.     TRPA's failure to achieve various environmental thresholds;

c.     regulatory changes to the Regional Plan and Code and other area plans, such as new ADU provisions, changes to other development standards, and the adoption of a new VMT threshold, that have not been comprehensively addressed in an environmental impact statement;

d.     climate change and increased wildfire risk and attendant impacts to water temperature and quality, air pollution, and public safety;

e.     further degradation of Lake Tahoe's water quality and threats to its habitat value, including water quality degradation with microplastics and aquatic invasive species (AIS); and

f.     new commercial and residential, roadway and trail development.

63.     Because of the potential for significant impacts and the substantial change in circumstances since 2012, a new or supplemental EIS was required that would: address the impacts of the Amendments in light of current circumstances; allow members of the public, as well as state, local and federal agencies, a noticed public comment period; and require TRPA to put forth and consider mitigation measures and alternatives. At a minimum, TRPA was required to prepare an EA to further evaluate the potential for significant environmental impacts and consider alternatives and mitigation.

64.     TRPA's findings in support of the Amendments are arbitrary and capricious and not supported by substantial evidence. Its finding that the Amendments "could not" have a significant effect on the environment are not supported by the IEC or the record, which show that the Amendments could result in significant environmental impacts and further detailed review was required.

## TRPA FAILED TO ENSURE AND MAKE ADEQUATE FINDINGS THAT THE AMENDMENTS ACHIEVE AND MAINTAIN THE ENVIRONMENTAL THRESHOLDS FOR THE TAHOE BASIN AND COMPLY WITH THE CLEAN WATER ACT'S ANTI-DEGRADATION POLICY FOR OUTSTANDING NATIONAL RESOURCE WATERS

65.     TRPA's conclusion that the Amendments would achieve and maintain Basin Thresholds and water quality standards was arbitrary and capricious, lacking in substantial evidentiary support, and in violation of the Compact, the Regional Plan, and TRPA regulations.

66.     TRPA's conclusion that the Amendments "achieve and maintain" the thresholds largely relies on the findings for the 2012 Regional Plan. The Amendments, however, eliminate the height, density, and coverage maximums on which those findings were based. Moreover, the Amendments fail to ensure implementation of the compliance measures designed to achieve water quality, soils, transportation, scenic, vegetation, wildlife, and fish thresholds by allowing additional height and density and coverage and decreasing parking requirements. Given that the region is out of attainment with water quality thresholds aimed at improving the Lake's water clarity, TRPA is required not simply to maintain the status quo, but to take action to achieve these standards. The Amendments are designed to focus and accelerate new development in areas, many of which are near or directly adjacent to the Lake, while eliminating density and coverage requirements. The record fails to support TRPA's claim, based on outdated findings, that these actions will improve water quality and ensure that other environmental thresholds are achieved and maintained.

67.     Likewise, the Amendments fail to ensure compliance with Clean Water Act standards for Lake Tahoe as required by Article V(d) of the Compact. Under the Clean Water Act's system of cooperative federalism, the States are delegated with establishing water quality standards for intrastate waters. 33 U.S.C. §§ 1311(b)(1)(C), 1313. These standards must incorporate an antidegradation policy, which at a minimum, must maintain

1  three tiers of water quality. 40 C.F.R. § 131.12(a). California has adopted an

2  antidegradation policy that protects Lake Tahoe under the most stringent of the three tiers

3  as an "Outstanding National Resource Water" ("ONRW"). This designation "prohibits any

4  degradation of existing water quality standards with a limited exception for short-term or

5  temporary changes in quality." *Nat'l Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1127

6  (D.C.Cir.1997) (citing Water Quality Standards Regulation, 48 Fed. Reg. 51,400, 51,403

7  (1983)). The record fails to support a finding that the Amendments would not degrade the

8  water quality of Lake Tahoe.

9       68.    TRPA's findings also fail to take into account existing environmental

10  conditions and the cumulative effects of regional growth and development, together with

11  the Amendments, and fail to evaluate whether the Amendments would ensure that TRPA's

12  newly adopted VMT Thresholds would be achieved and maintained.

13  **THE AMENDMENTS AND TRPA FINDINGS FAIL TO CONFORM TO THE**

14  **COMPACT, THE REGIONAL PLAN, AND TRPA REGULATIONS**

15       69.    The Amendments violate the Compact and fail to conform to the Regional

16  Plan. In addition, TRPA's findings that the Amendments are consistent with and will not

17  adversely affect implementation of the Regional Plan and other applicable TRPA plans and

18  policies are arbitrary and capricious and lacking in substantial evidentiary support.

19       70.    In 2016, the Compact was amended to require that the Governing Board

20  "continuously review and maintain the regional plan and . . . ensure that the regional plan

21  reflects changing economic conditions and the economic effect of regulation on

22  commerce." Compact, Art. V. All required TRPA findings must be supported by

23  substantial evidence in the record and must "be accompanied by a brief statement of the

24  facts and rationales upon which they are based." TRPA Code Section 4.3. The adopted

25  Amendments eliminate the requirement that bonus units include affordable housing and

26  therefore do not address and reflect current economic conditions in violation of the

27  Compact. Moreover, these and other changes adopted at the December 13, 2023 Board

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1  meeting were adopted without prior notice and without findings setting forth evidence and

2  rationale in support of the changes.

3       71.    The Compact authorizes TRPA to adopt "minimum" environmental and

4  land use standards but provides that any "political subdivision or public agency may adopt

5  and enforce an equal or higher requirement applicable to the same subject of regulation in

6  its territory." Compact, Art. VI(a). The TRPA Code also generally allows local plans to

7  adopt "equal or superior measures" to achieve thresholds. TRPA Code 12.6.3. The

8  Amendments improperly preempt this authority by providing that the Amendments

9  supersede non-conforming standards in local plans. Local jurisdictions cannot adopt non-

10  conforming environmentally protective standards, such as lower density or height

11  maximums, without demonstrating that the standards are at least as effective economically

12  in facilitating the construction of designated housing.

13       72.    The Regional Plan includes policies and goals to achieve the development of

14  affordable housing. For example, Plan policies require that bonus units be given to

15  "promote affordable or government-assisted housing for lower income households (80

16  percent of respective County's median income) and for very low income households (50

17  percent of respective County's median income)." Regional Plan, Policy HS-1.1. The Plan

18  further provides that moderate income housing should be encouraged only "to the extent

19  feasible, without compromising the growth management provisions of the regional plan,

20  the attainment of threshold goals, and affordable housing incentive programs." Regional

21  Plan, Goal HS-2; *see also* Policy HS-3.1 ("TRPA shall regularly review its policies and

22  regulations to remove identified barriers preventing the construction of necessary

23  affordable housing in the region"); Policy DP-3.1(B) (bonus units "shall be prioritized for

24  affordable housing projects and projects within community plans and Centers").

25       73.    TRPA ordinances must implement and "effectuate" the Regional Plan.

26  Compact, Art. VI(a). By eliminating the requirement that bonus units include affordable

27  housing, the Amendments are inconsistent with goals and policies in the Regional Plan and

28

<div align="center">23</div>

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

do not effectuate the Plan's purposes. The Governing Board modified the affordable housing requirements with no substantial evidence and the findings failed to include a statement of facts and rationales upon which the modification was based.

74.    The Regional Plan also focuses on ensuring affordable housing is compatible with neighborhood scale and density and focuses new development in Centers. *See* Regional Plan, Policy HS-1.4 (affordable housing should be located near transit and employment centers and "must be compatible with the scale and density of the surrounding neighborhood"); Policy LU-3.4 ("Existing development patterns in residential neighborhoods outside of centers and environmentally-sensitive lands should be maintained with no significant change.").

75.    The Amendments do not ensure that affordable development is compatible with the scale and density of existing neighborhoods and do not maintain existing development patterns outside of Centers and are therefore inconsistent with goals and policies in the Regional Plan and do not effectuate the Plan's purposes.

**TRPA'S APPROVAL OF THE AMENDMENTS VIOLATED THE PROCEDURAL REQUIREMENTS OF THE COMPACT AND TRPA REGULATIONS**

76.    The Compact requires that where the Governing Board initiates or adopts a plan or amendment without referring it to the Planning Commission, it must hold at least one public hearing after due notice. Compact, Art. V(1). The Board must comply with the open meeting laws of California or Nevada, whichever imposes the stricter requirement. Compact, Art. III(d). The TRPA Rules also require that the Board give notice of proposed ordinances, including a "draft or a summary" of the ordinance at least 20 days before the hearing. TRPA Rules Section 4.3. Likewise, California and Nevada open meeting laws require that agenda descriptions clearly describe the subject matter of ordinances or regulations proposed for adoption or amendment.

77.    Here, the Governing Board violated these provisions because the draft ordinance and summary provided to the public gave no notice that the Board was

24

1  considering significant modifications to the Amendments, including eliminating the

2  existing TRPA Code requirement that half of bonus units be designated for affordable

3  housing and modifying the proposed stormwater treatment provisions.

4         78.     The Compact also states that every adopted ordinance is a public record and

5  should be "open to inspection" and that each adopted ordinance must "be transmitted to the

6  governing body of each political subdivision having territory within the region"

7  immediately after adoption. Compact, Arts. III(i) & VI(a). TRPA provides copies of its

8  Regional Plan, ordinances and numerous other official plans and policies on its official

9  website and members of the public look to the website for accurate and up-to-date

10 information. Code amendments adopted in 2023 are published on the TRPA website under

11 the heading "2023 Code Amendments." Ordinance 2023-07 does not contain the text of the

12 code amendments, but references the amendments as "Attachment B." Weeks after the

13 approvals, although the "2023 Code Amendments" webpage included a link to "Ordinance

14 2023-07" and a separate link to the related "Amendments," the "Amendments" link was

15 not to the version of Attachment B adopted by the Governing Board on December 13,

16 2023, but to an earlier draft: "https://www.trpa.gov/wp-content/uploads/Attachment-

17 B_AMENDMENTS_November-1." By providing members of the public with an incorrect

18 and misleading version of the Amendments, TRPA sowed confusion amongst the public,

19 including local counties and cities, about what changes the Governing Board actually

20 adopted, and precluded an accurate public understanding of the effect of the Amendments.

21        79.     As a result of the foregoing defects, TRPA's approvals of the Amendments

22 were arbitrary, capricious, lacking in substantial evidentiary support, and in violation of

23 the law and must be set aside.

24                              **REQUEST FOR RELIEF**

25        WHEREFORE, MAP respectfully requests this Court grant the following relief:

26

27

28
                                              25

1.      Adjudge and declare that the Amendments, and TRPA's approvals of the Amendments, violated the Compact, the Regional Plan and TRPA regulations and the Amendments are therefore invalid.

2.      Adjudge and declare that the Amendments may result in significant environmental impacts and that TRPA's approval of the Amendments based on a FONSE and IEC violated the Compact, the Regional Plan, and TRPA regulations.

3.      Issue an order, including a preliminary and permanent injunction and/or writ of mandate, enjoining TRPA, its agents and employees, and all persons, agencies, commissions and boards acting under, or in concert with or for them, from implementing the Amendments or approving any development based on the Amendments unless and until TRPA can demonstrate that it has complied with the Compact, the Regional Plan, and TRPA regulations, including preparation of appropriate environmental review;

5.      Issue an order or writ of mandate setting aside the Amendments and TRPA's approvals of the Amendments and directing TRPA to prepare an EIS prior to re-approving the Amendments.

6.      Award Plaintiffs their reasonable attorneys' fees, costs of suit, expert witness fees, interest, and disbursements pursuant to all applicable legal authority including, but not limited to, California Code of Civil Procedure Section 1021.5, the common law private attorney general doctrine, 28 U.S.C. Section 1920, 28 U.S.C. Section 2202, 28 U.S.C. Section 2412(d), 33 U.S.C. Section 1365(d), Federal Rule of Civil Procedure 54, and any and all other provisions of law or equity; and

7.      Award such other and further relief as the Court deems proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1  DATED: February 9, 2024                 SHUTE, MIHALY & WEINBERGER LLP

2                                          By:        /s/Amy J. Bricker

3
                                               AMY J. BRICKER
4                                              SUSANNAH T. FRENCH

5
                                               Attorneys for Plaintiff
6                                              Mountain Area Preservation Foundation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

EXHIBIT A

# THE COMPACT



128 Market Street
PO Box 5310
Stateline, NV 89449

Public Law 96-551
96th Congress

An Act

To grant the consent of the Congress to the Tahoe Regional Planning Compact, and to authorize the Secretary of Agriculture and others to cooperate with the planning agency thereby created.

Dec.19. 1980
[H.R. 8235]

*Be it enacted by the Senate and House of Representatives of the Unites States of America in Congress assembled*, That in order to encourage the wise use and conservation of the waters of Lake Tahoe and of the resources of the area around said lake, the consent of the Congress is hereby given to the Tahoe Regional Planning Compact heretofore adopted by the States of California and Nevada, which compact reads as follows:

Tahoe
Regional
Planning
Compact

TAHOE REGIONAL PLANNING COMPACT

ARTICLE I. - FINDINGS AND DECLARATIONS OF POLICY

(a) It is found and declared that:

(1) The waters of Lake Tahoe and other resources of the region are threatened with deterioration or degeneration, which endangers the natural beauty and economic productivity of the region.

(2) The public and private interests and investments in the region are substantial.

(3) The region exhibits unique environmental and ecological values which are irreplaceable.

(4) By virtue of the special conditions and circumstances of the region's natural ecology, developmental pattern, population distributions and human needs, the region is experiencing problems of resource use and deficiencies of environmental control.

(5) Increasing urbanization is threatening the ecological values of the region and threatening the public opportunities for use of the public lands.

(6) Maintenance of the social and economic health of the region depends on maintaining the significant scenic, recreational, educational, scientific, natural and public health values provided by the Lake Tahoe Basin.

(7) There is a public interest in protecting, preserving and enhancing these values for the residents of the region and for visitors to the region.

(8) Responsibilities for providing recreational and scientific opportunities, preserving scenic and natural areas, and safeguarding the public who live, work and play in or visit the region are divided among local governments, regional agencies, the States of California and Nevada, and the Federal Government.

(9) In recognition of the public investment and multistate and national significance of the recreational values, the Federal Government has an interest in the acquisition of recreational property and the management of resources in the region to preserve environmental and recreational values, and the Federal Government should assist the States in fulfilling their responsibilities.

(10) In order to preserve the scenic beauty and outdoor recreational opportunities of the region, there is a need to insure an equilibrium between the region's natural endowment and its manmade

environment.

(b) In order to enhance the efficiency and governmental effectiveness of the region, it is imperative that there be established a Tahoe Regional Planning Agency with the powers conferred by this compact including the power to establish environmental carrying capacities and to adopt and enforce a regional plan and implementing ordinances which will achieve and maintain such capacities while providing opportunities for orderly growth and development consistent with such capacities.

(c) The Tahoe Regional Planning Agency shall interpret and administer its plans, ordinances, rules and regulations in accordance with the provision of this compact.

## ARTICLE II. – DEFINITIONS

As used in this compact:

(a) "Region," includes Lake Tahoe, the adjacent parts of Douglas and Washoe Counties and Carson City, which for the purposes of this compact shall be deemed a county, lying within the Tahoe Basin in the State of Nevada, and the adjacent parts of the counties of Placer and El Dorado lying within the Tahoe Basin in the State of California, and that additional and adjacent part of the county of Placer outside of the Tahoe Basin in the State of California which lies southward and eastward of a line starting at the intersection of the basin crestline and the north boundary of section 1, thence west to the northwest corner of section 3, thence south to the intersection of the basin crestline and the west boundary of section 10; all sections referring to township 15 north, range 16 east, M. D. B. & M. The region defined and described herein shall be as precisely delineated on official maps of the agency.

(b) "Agency" means the Tahoe Regional Planning Agency.

(c) "Governing body" means the governing board of the Tahoe Regional Planning Agency.

(d) "Regional plan" means the long-term general plan for the development of the region.

(e) "Planning commission" means the advisory planning commission appointed pursuant to subdivision (h) of article III.

(f) "Gaming" means to deal, operate, carry on, conduct, maintain or expose for play any banking or percentage game played with cards, dice or any mechanical device or machine for money, property, checks, credit or any representative of value, including, without limiting the generality of the foregoing, faro, monte, roulette, keno, bingo, fantan, twenty-one, blackjack, seven-and-a-half, big injun, klondike, craps, stud poker, draw poker or slot machine, but does not include social games played solely for drinks, or cigars or cigarettes served individually, games played in private homes or residences for prizes or games operated by charitable or educational organizations, to the extent excluded by applicable State law.

(g) "Restricted gaming license" means a license to operate not more than 15 slot machines on which a quarterly fee is charged pursuant to NRS 463.373 and no other games.

(h) "Project" means an activity undertaken by any person, including any public agency, if the activity may substantially affect the land, water, air, space or any other natural resources of the region.

(i) "Environmental threshold carrying capacity" means an environmental standard necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region. Such standards shall include but not be limited to standards for air quality, water quality, soil conservation, vegetation preservation and noise.

(j) "Feasible" means capable of being accomplished in a successful manner within a reasonable

period of time, taking into account economic, environmental, social and technological factors.

(k) "Areas open to public use" means all of the areas within a structure housing gaming under a nonrestricted license except areas devoted to the private use of guests.

(l) "Areas devoted to private use of guests" means hotel rooms and hallways to serve hotel room areas, and any parking areas. A hallway serves hotel room areas if more than 50 percent of the areas on each side of the hallway are hotel rooms.

(m) "Nonrestricted license" means a gaming license which is not a restricted gaming license.

## ARTICLE III. – ORGANIZATION

(a)  There is created the Tahoe Regional Planning Agency as a separate legal entity.
Establishment

The governing body of the agency shall be constituted as follows:

(1) California delegation:
California delegation membership

(A) One member appointed by each of the county boards of supervisors of the counties of El Dorado and Placer and one member appointed by the city council of the city of South Lake Tahoe. Any such member may be a member of the county board of supervisors or city council, respectively, and shall reside in the territorial jurisdiction of the governmental body making the appointment.

(B) Two members appointed by the Governor of California, one member appointed by the speaker of the assembly of California and one member appointed by the senate rules committee of the State of California. The members appointed pursuant to this subparagraph shall not be residents of the region and shall represent the public at large within the State of California.

(2) Nevada delegation:
Nevada delegation membership

(A) One member appointed by each of the boards of county commissioners of Douglas and Washoe Counties and one member appointed by the board of supervisors of Carson City. Any such member may be a member of the board of county commissioners or board of supervisors, respectively, and shall reside in the territorial jurisdiction of the governmental body making the appointment.

(B) One member appointed by the Governor of Nevada, the secretary of State of Nevada or his designee, and the director of the State department of conservation and natural resources of Nevada or his designee. Except for the secretary of State and the director of the State department of conservation and natural resources, the members or designees appointed pursuant to this subparagraph shall not be residents of the region. All member appointed pursuant to this subparagraph shall represent the public at large within the State of Nevada.
94 STAT. 3235

(C) One member appointed for a 1-year term by the six other members of the Nevada delegation. If at least four members of the Nevada delegation are unable to agree upon the selection of a seventh member within 60 days after the effective date of the amendments to this compact or the occurrence of a vacancy on the governing body for that State the Governor of the State of Nevada shall make such an appointment. The member appointed pursuant to this subparagraph may, but it is not required to, be a

resident of the region within the State of Nevada.

(3) If any appointing authority under paragraph (1)(A), (1)(B), (2)(A) or (2)(B) fails to make such an appointment within 60 days after the effective date of the amendments to this compact or the occurrence of a vacancy on the governing body, the Governor of the State in which the appointing authority is located shall make the appointment. The term of any member so appointed shall be 1 year.

<div style="float:right">Term</div>

(4) The position of any member of the governing body shall be deemed vacant if such a member is absent from three consecutive meetings of the governing body in any calendar year.

<div style="float:right">Vacancies</div>

(5) Each member and employee of the agency shall disclose his economic interests in the region within 10 days after taking his seat on the governing board or being employed by the agency and shall thereafter disclose any further economic interest which he acquires, as soon as feasible after he acquires it. As used in this paragraph, "economic interests" means:

<div style="float:right">"Economic Interests"</div>

(A) Any business entity operating in the region in which the member or employee has a direct or indirect investment worth more than $1,000.

(B) Any real property located in the region in which the member or employee has a direct or indirect interest worth more than $1,000.

(C) Any source of income attributable to activities in the region, other than loans by or deposits with a commercial lending institution in the regular course of business, aggregating $250 or more in value received by or promised to the member within the preceding 12 months; or

(D) Any business entity operating in the region which the member or employee is a director, officer, partner, trustee, employee or holds any position of management.

No member or employee of the agency shall make, or attempt to influence, an agency decision in which he knows or has reason to know he has an economic interest. Members and employees of the agency must disqualify themselves from making or participating in the making of the agency when it is reasonably foreseeable that the decision with have a material financial effect, distinguishable from its effect on the public generally, on the economic interests of the member or employee.

(b) The members of the agency shall serve without compensation, but the expenses of each member shall be met by the body which he represents in accordance with the law of that body. All other expenses incurred by the governing body in the course of exercising the powers conferred upon it by this compact unless met in some other manner specifically provided, shall be paid by the agency out of its own funds.

<div style="float:right">Expenses</div>

<div style="float:right">94 STAT. 3237</div>

(c) Except for the secretary of State and the director of the State department of conservation and natural resources of Nevada and the member appointed pursuant to subdivision (a)(2)(C), the members of the governing body serve at the pleasure of the appointing authority in each case, but each appointment shall be reviewed no less often than every 4 years. Members may be reappointed.

(d) The governing body of the agency shall meet at least monthly. All meetings shall be open to the public to the extent required by the law of the State of California or the State of Nevada, whichever imposes the greater requirement, applicable to local governments at the time such meeting is held. The governing body shall fix a date for its regular monthly meetings in such terms as "the first Monday of each month," and shall not change such a date more often than once in any calendar year. Notice of the

<div style="float:right">Monthly Meetings</div>

date so fixed shall be given by publication at least once in a newspaper or combination of newspapers whose circulation is general throughout the region and in each county a portion of whose territory lies within the region. Notice of any special meeting, except an emergency meeting, shall be given by so publishing the date and place and posting an agenda at least 5 days prior to the meeting.

(e) The position of a member of the governing body shall be considered vacant upon his loss of any of the qualifications required for his appointment and in such event the appointing authority shall appoint a successor.

<div align="right">Vacancies</div>

(f) The governing body shall elect from its own members a chairman and vice chairman, whose terms of office shall be 2 years, and who may be reelected. If a vacancy occurs in either office, the governing body may fill such a vacancy for the unexpired term.

<div align="right">Chairman</div>

(g) Four of the members of the governing body from each State constitute a quorum for the transaction of the business of the agency. The voting procedures shall be as follows:

<div align="right">Voting Procedures</div>

(1) For adopting, amending or repealing environmental threshold carrying capacities, the regional plan, and ordinances, rules and regulations, and for granting variances from the ordinances, rules and regulations, the vote of at least four of the members of each State agreeing with the vote of at least four members of the other State shall be required to take action. If there is no vote of at least four of the members from one State agreeing with the vote of at least four members of the other State on the actions specified in this paragraph, an action of rejection shall be deemed to have been taken.

(2) For approving a project, the affirmative vote of at least five members from the State in which the project is located and the affirmative vote of at least nine members of the governing body are required. If at least five members of the governing body from the State in which the project is located and at least nine members of the entire governing body do not vote in favor of the project, upon a motion for approval, an action of rejection shall be deemed to have been taken. A decision by the agency to approve a project shall be supported by a statement of findings, adopted by the agency, which indicates that the project complies with the regional plan and with applicable ordinances, rules and regulations of the agency.

(3) For routine business and for directing the agency's staff on litigation and enforcement actions, at least eight members of the governing body must agree to take action. If at least eight votes in favor of such action are not cast, an action of rejection shall be deemed to have been taken.

<div align="right">94 STAT. 3238</div>

Whenever under the provisions of this compact or any ordinance, rule, regulation or policy adopted pursuant thereto, the agency is required to review or approve any project, public or private, the agency shall take final action by vote, whether to approve, to require modification or to reject such project, within 180 days after the application for such project is accepted as complete by the agency in compliance with the agency's rules and regulations governing such delivery unless the applicant has agreed to an extension of this time limit. If a final action by vote does not take place within 180 days, the applicant may bring an action in court of competent jurisdiction to compel a vote unless he has agreed to an extension. This provision does not limit the right of any person to obtain judicial review of agency action under subdivision (h) of Article VI. The vote of each member of the governing body shall be individually recorded. The governing body shall adopt its own rules, regulations and procedures.

(h) An advisory planning commission shall be appointed by the agency. The commission shall include: The chief planning officers of Placer County, El Dorado County, and the city of South Lake Tahoe in California and of Douglas County, Washoe County and Carson City in Nevada, the executive

<div align="right">Advisory Planning Commission</div>

officer of the Lahontan Regional Water Quality Control Board of the State of California, the executive officer of the Air Resources Board of the State of California, the director of the State department of conservation and natural resources of the State of Nevada, the administrator of the division of environmental protection in the State department of conservation and natural resources of the State of Nevada, the administrator of the Lake Tahoe Management Unit of the United States Forest Service, and at least four lay members with an equal number from each State, at least half of whom shall be residents of the region. Any official member may designate an alternate.

The term of office of each lay member of the advisory planning commission shall be 2 years. Members may be reappointed.

The position of each member of the advisory planning commission shall be considered vacated upon loss of any of the qualifications required for appointments, and in such an event the appointing authority shall appoint a successor.

The advisory planning commission shall elect from its own members a chairman and a vice chairman, whose terms of office shall be 2 years and who may be reelected. If a vacancy occurs in either office, the advisory planning commission shall fill such vacancy for the unexpired term.

A majority of the members of the advisory planning commission constitutes a quorum for the transaction of the business of the commission. A majority vote of the quorum present shall be required to take action with respect to any matter.

(i) The agency shall establish and maintain an office within the region, and for this purpose the agency may rent or own property and equipment. Every plan, ordinance and other record of the agency which is of such nature as to constitute a public record under the law of either the State of California or the State of Nevada shall be open to inspection and copying during regular office hours.

(j) Each authority charged under this compact or by the law of either State with the duty of appointing a member of the governing body of the agency shall by certified copy of its resolution or other action notify the Secretary of State of its own State of the action taken.

## ARTICLE IV. – PERSONNEL

(a) The governing body shall determine the qualification of, and it shall appoint and fix the salary of, the executive officer of the agency, and shall employ such other staff and legal counsel as may be necessary to execute the powers and functions provided for under this compact or in accordance with any intergovernmental contracts or agreements the agency may be responsible for administering.

(b) Agency personnel standards and regulations shall conform insofar as possible to the regulations and procedures of the civil service of the State of California or the State of Nevada, as may be determined by the governing body of the agency; and shall be regional and bistate in application and effect; provided that the governing body may, for administrative convenience and at its discretion, assign the administration of designated personnel arrangements to an agency of either State, and provided that administratively convenient adjustments be made in the standards and regulations governing personnel assigned under intergovernmental agreements.

(c) The agency may establish and maintain or participate in such additional programs of employee benefits as may be appropriate to afford employees of the agency terms and conditions of employment similar to those enjoyed by employees of California and Nevada generally.

## ARTICLE V. – PLANNING

(1) In preparing each of the plans required by this article and each amendment thereto, if any, subsequent to its adoption, the planning commission after due notice shall hold at least one public hearing which may be continued from time to time, and shall review the testimony and any written

---

Term

Vacancy

Chairman and vice chairman, terms

94 STAT. 3239

Hearing

recommendations presented at such hearing before recommending the plan or amendment. The notice required by this subdivision shall be given at least 20 days prior to the public hearing by publication at least once in a newspaper or combination of newspapers whose circulation is general throughout the region and in each county a portion of whose territory lies within the region.

The planning commission shall then recommend such plan or amendment to the governing body for adoption by ordinance. The governing body may adopt, modify or reject the proposed plan or amendment, or may initiate and adopt a plan or amendment without referring it to the planning commission. If the governing body initiates or substantially modifies a plan or amendment, it shall hold at least one public hearing thereon after due notice as required in this subdivision.

If a request is made for the amendment of the regional plan by:

(1) A political subdivision a part of whose territory would be affected by such amendment; or

(2) The owner or lessee of real property which would be affected by such amendment, the governing body shall complete its action on such amendment within 180 days after such request is accepted as complete according to standards which must be prescribed by ordinance of the agency.

(b) The agency shall develop, in cooperation with the States of California and Nevada, environmental threshold carrying capacities for the region. The agency should request the President's Council on Environmental Quality, the U. S. Forest Service and other appropriate agencies to assist in developing such environmental threshold carrying capacities. Within 18 months after the effective date of the amendments to this compact, the agency shall adopt environmental threshold carrying capacities for the region.

<div style="float:right">Environmental Threshold Carrying Capacities.

94 STAT. 3240</div>

(c) Within 1 year after the adoption of the environmental threshold carrying capacities for the region, the agency shall amend the regional plan so that, at a minimum, the plan and all its elements, as implemented through agency ordinances, rules and regulations, achieves and maintains the adopted environmental threshold carrying capacities. Each element of the plan shall contain implementation provisions and time schedules for such implementation by ordinance. The planning commission and governing body shall continuously review and maintain the regional plan and, in so doing, shall ensure that the regional plan reflects changing economic conditions and the economic effect of regulation on commerce[1]. The regional plan shall consist of a diagram, or diagrams, and text, or texts setting forth the projects and proposals for implementation of the regional plan, a description of the needs and goals of the region and a statement of the policies, standards and elements of the regional plan.

<div style="float:right">Regional plans.</div>

The regional plan shall be a single enforceable plan and includes all of the following correlated elements:

(1) A land-use plan for the integrated arrangement and general location and extent of, and the criteria and standards for, the uses of land, water, air, space and other natural resources within the region, including but not limited to an indication or allocation of maximum population densities and permitted uses.

<div style="float:right">Land-use.</div>

(2) A transportation plan for the integrated development of a regional system of transportation, including but not limited to parkways, highways, transportation facilities, transit routes, waterways, navigation facilities, public transportation facilities, bicycle facilities, and appurtenant terminals and facilities for the movement of people and goods within the region. The

<div style="float:right">Transportation</div>

---

[1] As amended by Public Law 114-322, 130 Stat. 1628, sec. 3603 (2016).

goal of transportation planning shall be:

> (A) To reduce dependency on the automobile by making more effective use of existing transportation modes and of public transit to move people and goods within the region; and

> (B) To reduce to the extent of feasible air pollution which is caused by motor vehicles.

Where increases in capacity are required, the agency shall give preference to providing such capacity through public transportation and public programs and projects related to transportation. The agency shall review and consider all existing transportation plans in preparing its regional transportation plan pursuant to this paragraph.

> The plan shall provide for an appropriate transit system for the region.

> The plan shall give consideration to:

> (A) Completion of the Loop Road in the States of Nevada and California;

> (B) Utilization of a light rail mass transit system in South Shore area; and

> (C) Utilization of a transit terminal in the Kingsbury Grade area.

Until the regional plan is revised, or a new transportation plan is adopted in accordance with this paragraph, the agency has no effective transportation plan.

> (3) A conservation plan for the preservation, development, utilization, and management of the scenic and other natural resources within the basin, including but not limited to, soils, shoreline and submerged lands, scenic corridors along transportation routes, open spaces, recreational and historical facilities.

Conservation

94 STAT. 3241

> (4) A recreation plan for the development, utilization, and management of the recreational resources of the region, including but not limited to, wilderness and forested lands, parks and parkways, riding and hiking trails, beaches and playgrounds, marinas, areas for skiing and other recreational facilities.

Recreation.

> (5) A public services and facilities plan for the general location, scale and provision of public services and facilities, which, by the nature of their function, size, extent and other characteristics are necessary or appropriate for inclusion in the regional plan.

Public services and facilities

> In formulating and maintaining the regional plan, the planning commission and governing body shall take account of and shall seek to harmonize the needs of the region as a whole, the plans of the counties and cities within the region, the plans and planning activities of the State, Federal and other public agencies and nongovernmental agencies and organizations which affect or are concerned with planning and development within the region.

(d) The regional plan shall provide for attaining and maintaining Federal, State, or local air and water quality standards, whichever are strictest, in the respective portions of the region for which the standards are applicable.

The agency may, however, adopt air or water quality standards or control measures more stringent than the applicable State implementation plan or the applicable Federal, State, or local standards for the region, if it finds that such additional standards or control measures are necessary to achieve the

purposes of this compact. Each element of the regional plan, where applicable shall, by ordinance, identify the means and time schedule by which air and water quality standards will be attained.

(e) Except for the Regional Transportation Plan of the California Tahoe Regional Planning Agency, the regional plan, ordinances, rules and regulations adopted by the California Tahoe Regional Planning Agency in effect on July 1, 1980, shall be the regional plan, ordinances, rules and regulations of the Tahoe Regional Planning Agency for that portion of the Tahoe region located in the State of California. Such plan, ordinance, rules or regulation may be amended or repealed by the governing body of the agency. The plans, ordinances, rules and regulations of the Tahoe Regional Planning Agency that do not conflict with, or are not addressed by, the California Tahoe Regional Planning Agency's plans, ordinances, rules and regulations referred to in this subdivision shall continue to be applicable unless amended or repealed by the governing body of the agency. No provision of the regional plan, ordinances, rules and regulations of the California Tahoe Regional Planning Agency referred to in this subdivision shall apply to that portion of the region within the State of Nevada, unless such provision is adopted for the Nevada portion of the region by the governing body of the agency.

(f) The regional plan, ordinances, rules and regulations of the Tahoe Regional Planning Agency apply to that portion of the region within the State of Nevada.

(g) The agency shall adopt ordinances prescribing specific written findings that the agency must make prior to approving any project in the region. These findings shall relate to environmental protection and shall insure that the project under review will not adversely affect implementation of the regional plan and will not cause the adopted environmental threshold carrying capacities of the region to be exceeded.

94 STAT. 3242

(h) The agency shall maintain the data, maps and other information developed in the course of formulating and administering the regional plan, in a form suitable to assure a consistent view of developmental trends and other relevant information for the availability of and use by other agencies of government and by private organizations and individuals concerned.

(i) Where necessary for the realization of the regional plan, the agency may engage in collaborative planning with local governmental jurisdictions located outside the region, but contiguous to its boundaries. In formulating and implementing the regional plan, the agency shall seek the cooperation and consider the recommendations of counties and cities and other agencies of local government, of State and Federal agencies, of educational institutions and research organizations, whether public or private, and of civic groups and private persons.

## ARTICLE VI. - AGENCY'S POWERS

(a) The governing body shall adopt all necessary ordinances, rules, and regulations to effectuate the adopted regional plan. Except as otherwise provided in this compact, every such ordinance, rule or regulation shall establish a minimum standard applicable throughout the region. Any political subdivision or public agency may adopt and enforce an equal or higher requirement applicable to the same subject of regulation in its territory. The regulations of the agency shall contain standards including but not limited to the following: Water purity and clarity; subdivision; zoning; tree removal; solid waste disposal; sewage disposal; land fills, excavation, cuts and grading; piers, harbors, breakwaters or channels and other shoreline developments; waste disposal in shoreline areas; waste disposal from boats; mobile-home parks; house relocation; outdoor advertising; flood plain protection; soil and sedimentation control; air pollution; and watershed protection. Whenever possible without diminishing the effectiveness of the regional plan, the ordinances, rules, regulations and policies shall be confined to matters which are general and regional in application, leaving to the jurisdiction of the respective States, counties and cities the enactment of specific and local ordinances, rules, regulations and policies which conform to the regional plan.

PUBLIC LAW 96-551—DEC. 19, 1980

The agency shall prescribe by ordinance those activities which it has determined will not have substantial effect on the land, water, air, space or any other natural resources in the region and therefore will be exempt from its review and approval.

Every ordinance adopted by the agency shall be published at least once by title in a newspaper or combination of newspapers whose circulation is general throughout the region. Except an ordinance adopting or amending the regional plan, no ordinance shall become effective until 60 days after its adoption. Immediately after its adoption, a copy of each ordinance shall be transmitted to the governing body of each political subdivision having territory within the region.

(b) No project other than those to be reviewed and approved under the special provisions (d), (e), (f) and (g) may be developed in the region without obtaining the review and approval of the agency and no project may be approved unless it is found to comply with the regional plan and with the ordinances, rules and regulations enacted pursuant to a subdivision (a) to effectuate that plan. The agency may approve a project in the region only after making the written findings required by this subdivision or subdivision (g) of Article V. Such findings shall be based on substantial evidence in the record.

*Projects, developments*

Before adoption by the agency of the ordinances required in subdivision (g) of article V, the agency may approve a project in the region only after making written findings on the basis of substantial evidence in the record that the project is consistent with the regional plan then in effect and with applicable plans, ordinances, regulations, and standards of Federal and State agencies relating to the protection, maintenance and enhancement of environmental quality in the region.

*94 STAT. 3243*

(c) The legislatures of the States of California and Nevada find that in order to make effective the regional plan as revised by the agency, it is necessary to halt temporarily works of development in the region which might otherwise absorb the entire capability of the region for further development or direct it out of harmony with the ultimate plan. Subject to the limitation provided in this subdivision, from the effective date of the amendments to this compact until the regional plan is amended pursuant to subdivision (c) of article V, or until May 1, 1983, whichever is earlier:

*Developmental work, temporary halt*

(1) Except as otherwise provided in this paragraph, no new subdivision, planned unit development, or condominium project may be approved unless a complete tentative map or plan has been approved before the effective date of the amendments to this compact by all agencies having jurisdiction. The subdivision of land owned by a general improvement district, which existed and owned the land before the effective date of the amendments to this compact, may be approved if subdivision of the land is necessary to avoid insolvency of the district.

(2) Except as provided in paragraph (3), no apartment building may be erected unless the required permits for such building have been secured from all agencies have jurisdiction, prior to the effective date of the amendments to this compact.

(3) During each of the calendar years 1980, 1981 and 1982, no city or county may issue building permits which authorize the construction of a greater number of new residential units within the region than were authorized within the region by building permits issued by that city or county during the calendar year 1978. For the period of January through April, 1983, building permits authorizing the construction of no more than one-third of that number may be issued by each such city or county. For purposes of this paragraph a "residential unit" means either a single family residence or an individual residential unit within a larger building, such as an apartment building, a duplex or a condominium.

The legislatures find the respective numbers of residential units authorized within the region during the calendar year 1978 to be as follows:

Residential units, 1978

| | |
|---|---:|
| 1. City of South Lake Tahoe and El Dorado County (combined) | 252 |
| 2. Placer County | 278 |
| 3. Carson City | 0 |
| 4. Douglas County | 339 |
| 5. Washoe County | 739 |

(4) During each of the calendar years 1980, 1981 and 1982, no city or county may issue building permits which authorize construction of a greater square footage of new commercial buildings within the region than were authorized within the region by building permits for commercial purposes issued by that city or county during the calendar year 1978. For the period of January through April, 1983, building permits authorizing the construction of no more than one-third the amount of that square footage may be issued by each such city or county.

94 STAT. 3244

The legislatures find the respective square footages of commercial buildings authorized within the region during calendar year 1978 to be as follows:

Commercial buildings, 1978

| | |
|---|---:|
| 1. City of South Lake Tahoe and El Dorado County (combined) | 64,324 |
| 2. Placer County | 23,000 |
| 3. Carson City | 0 |
| 4. Douglas County | 57,354 |
| 5. Washoe County | 50,600 |

(5) No structure may be erected to house gaming under a nonrestricted license.

(6) No facility for the treatment of sewage may be constructed or enlarged except:

(A) To comply, as ordered by the appropriate State agency for the control of water pollution, with existing limitations of effluent under the Clean Water Act, 33 U. S. C. § 1251 et seq., and the applicable State law for control of water pollution;

(B) To accommodate development which is not prohibited or limited by this subdivision; or

(C) In the case of Douglas County Sewer District #1, to modify or otherwise alter sewage treatment facilities existing on the effective date of the amendments to this compact so that such facilities will be able to treat the total volume of effluent for which they were originally designed, which is 3.0 million gallons per day. Such modification or alteration is not a "project"; is not subject to the requirements of Article VII; and does not require a permit from the agency. Before commencing such modification or alteration, however, the district shall submit to the agency its report identifying any significant soil erosion problems which may be caused by such modifications or alterations and the measures which the district proposes to take to mitigate or avoid such problems.

The moratorium imposed by this subdivision does not apply to work done pursuant to a right vested before the effective date of the amendments to this compact. Notwithstanding the expiration date of the moratorium imposed by this subdivision, no new highway may be built or existing highway widened to accommodate additional continuous lanes for automobiles until the regional transportation plan is revised and adopted.

Highway construction

The moratorium imposed by this subdivision does not apply to the construction of any parking

Parking garage, construction

garage which has been approved by the agency prior to May 4, 1979, whether that approval was affirmative or by default. The provisions of this paragraph are not an expression of legislative intent that any such parking garage, the approval of which is the subject of litigation which was pending on the effective date of the amendments to this compact, should or should not be constructed. The provisions of this paragraph are intended solely to permit construction of such a parking garage if a judgment sustaining the agency's approval to construct that parking garage has become final and no appeal is pending or may lawfully be taken to a higher court.

(d) Subject to the final order of any court of competent jurisdiction entered in litigation contesting the validity of an approval by the Tahoe Regional Planning Agency, whether that approval was affirmative or by default, if that litigation was pending on May 4, 1979, the agency and the States of California and Nevada shall recognize as a permitted and conforming use:

<div style="text-align:right">Litigation</div>

<div style="text-align:right">94 STAT. 3245</div>

(1) Every structure housing gambling under a nonrestricted license which existed as a licensed gambling establishment on May 4, 1979, or whose construction was approved by the Tahoe Regional Planning Agency affirmatively or deemed approved before that date. The construction or use of any structure to house gaming under a nonrestricted license not so existing or approved, or the enlargement in cubic volume of any such existing or approved structure is prohibited.

(2) Every other nonrestricted gaming establishment whose use was seasonal and whose license was issued before May, 4, 1979, for the same season and for the number and type of games and slot machines on which taxes where paid in the calendar year 1978.

(3) Gaming conducted pursuant to a restricted gaming license issued before May 4, 1979, to the extent permitted by that license on that date.

The area within any structure housing gaming under a nonrestricted license which may be open to public use (as distinct from that devoted to the private use of guests and exclusive of any parking area) is limited to the area existing or approved for public use on May 4, 1979. Within these limits, any external modification of the structure which requires a permit from a local government also requires approval from the agency. The agency shall not permit restaurants, convention facilities, showrooms or other public areas to be constructed elsewhere in the region outside the structure in order to replace areas existing or approved for public use on May 4, 1979.

(e) Any structure housing licensed gaming may be rebuilt or replaced to a size not to exceed the cubic volume, height and land coverage existing or approved on May 4, 1979, without the review or approval of the agency or any planning or regulatory authority of the State of Nevada whose review or approval would be required for a new structure.

(f) The following provisions apply to any internal or external modification, remodeling, change in use, or repair of a structure housing gaming under a nonrestricted license which is not prohibited by article VI (d):

<div style="text-align:right">Structure housing gaming, modification</div>

(1) The agency's review of an external modification of the structure which requires a permit from a local government is limited to determining whether the external modification will do any of the following:

(A) Enlarge the cubic volume of the structure;

B) Increase the total square footage of area open to one approved for public use on May 4, 1979;

(C) Convert an area devoted to the private use of guests to an area open to public use;

(D) Increase the public area open to public use which is used for gaming beyond the limits contained in paragraph (3); and

(E) Conflict with or be subject to the provisions of any of the agency's ordinances that are generally applicable throughout the region.

The agency shall make this determination within 60 days after the proposal is delivered to the agency in compliance with the agency's rules or regulations governing such delivery unless the applicant has agreed to an extension of this time limit. If an external modification is determined to have any of the effects enumerated in subparagraphs (A) through (C), it is prohibited. If an external modification is determined to have any of the effects enumerated in subparagraphs (D) or (E), it is subject to the applicable provisions of this compact. It an external modification is determined to have no such effect, it is not subject to the provisions of this compact.

<div style="text-align: right">94 STAT. 3246</div>

(2) Except as provided in paragraph (3), internal modification, remodeling, change in use or repair of a structure housing gaming under a nonrestricted license is not a project and does not require the review or approval of the agency.

(3) Internal modification, remodeling, change in use or repair of areas open to public use within a structure housing gaming under a nonrestricted license which alone or in combination with any other such modification, remodeling, change in use or repair will increase the total portion of those areas which is actually used for gaming by more than the product of the total base area, as define below, in square feet existing on or approved before August 4, 1980, multiplied by 15 percent constitutes a project and is subject to all of the provisions of this compact relating to projects. For purposes of this paragraph and the determination required by Article VI(g), base area means all of the area within a structure housing gaming under a nonrestricted license which may be open to public use, whether or not gaming is actually conducted or carried on in that area, except retail stores, convention centers and meeting rooms, administrative offices, kitchens, maintenance and storage areas, rest rooms, engineering and mechanical rooms, accounting rooms and counting rooms.

<div style="text-align: right">Base Area</div>

(g) In order to administer and enforce the provisions of paragraphs (d), (e) and (f), the State of Nevada, through its appropriate planning or regulatory agency, shall require the owner or licensee of a structure housing gaming under a nonrestricted license to provide:

<div style="text-align: right">Enforcement provisions</div>

(1) Documents containing sufficient information for the Nevada agency to establish the following relative to the structure:

(A) The location of its external walls;

(B) Its total cubic volume;

(C) Within its external walls, the area in square feet open or approved for public use and the area in square feet devoted to or approved for the private use of guests on May 4, 1979;

(D) The amount of surface area of land under the structure; and

(E) The base area as defined in paragraph (f)(3) in square feet existing on or approved before August 4, 1980.

PUBLIC LAW 96-551—DEC. 19, 1980

(2) An informational report whenever any internal modification, remodeling, change in use, or repair will increase the total portion of the areas open to public use which is used for gaming.

The Nevada agency shall transmit this information to the Tahoe Regional Planning Agency.

(h) Gaming conducted pursuant to a restricted gaming license is exempt from review by the agency if it is incidental to the primary use of the premises.

(i) The provisions of subdivisions (d) and (e) are intended only to limit gaming and related activities as conducted within a gaming establishment, or construction designed to permit the enlargement of such activities, and not to limit any other use of property zoned for commercial use or the accommodation of tourists, as approved by the agency.

<div style="text-align: right">94 STAT. 3247

Violations</div>

(j) Legal actions arising out of or alleging a violation of the provisions of this compact, of the regional plan or of an ordinance or regulation of the agency or of a permit or a condition of a permit issued by the agency are governed by the following provisions:

(1) This subdivision applies to:

(A) Actions arising out of activities directly undertaken by the agency.

(B) Actions arising out of the issuance to a person of a lease, permit, license or other entitlement for use by the agency.

(C) Actions arising out of any other act or failure to act by any person or public agency.

Such legal actions may be filed and the provisions of this subdivision apply equally in the appropriate courts of California and Nevada and of the United States.

(2) Venue lies:

(A) If a civil or criminal action challenges an activity by the agency or any person which is undertaken or to be undertaken upon a parcel of real property, in the State or Federal judicial district where the real property is situated.

(B) if an action challenges an activity which does not involve a specific parcel of land (such as an action challenging an ordinance of the agency), in any State or Federal court having jurisdiction within the region.

<div style="text-align: right">"Aggrieved person"</div>

(3) Any aggrieved person may file an action in an appropriate court of the States of California or Nevada or of the United States alleging noncompliance with the provisions of this compact or with an ordinance or regulation of the agency. In the case of governmental agencies, "aggrieved person" means the Tahoe Regional Planning Agency or any State, Federal or local agency. In the case of any person other than a governmental agency who challenges an action of the Tahoe Regional Planning Agency, "aggrieved person" means any person who has appeared, either in person, through an authorized representative, or in writing, before the agency at an appropriate administrative hearing to register objection to the action which is being challenged, or who had good cause for not making such an appearance.

(4) A legal action arising out of the adoption or amendment of the regional plan or of any ordinance or regulation of the agency, or out of the granting or denial of any permit, shall be commenced within 60 days after final action by the agency. All other legal actions shall be commenced within 65 days after discovery of the cause of action.

(5) In any legal action filed pursuant to this subdivision which challenges an adjudicatory act or decision of the agency to approve or disapprove a project, the scope of judicial inquiry shall extend only to whether there was prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the agency has not proceeded in a manner required by law or if the act or decision of the agency was not supported by substantial evidence in light of the whole record. In making such a determination the court shall not exercise its independent judgment on evidence but shall only determine whether the act or decision was supported by substantial evidence in light of the whole record. In any legal action filed pursuant to this subdivision which challenges a legislative act or decision of the agency (such as the adoption of the regional plan and the enactment of implementing ordinances), the scope of the judicial inquiry shall extend only to the questions of whether the act or decision has been arbitrary, capricious or lacking substantial evidentiary support or whether the agency has failed to proceed in a manner required by law.

94 STAT. 3248

(6) The provisions of this subdivision do not apply to any legal proceeding pending on the date when this subdivision becomes effective. Any such legal proceeding shall be conducted and concluded under the provisions of law which were applicable prior to the effective date of this subdivision.

(7) The security required for the issuance of a temporary restraining order or preliminary injunction based upon an alleged violation of this compact or any ordinance, plan, rule or regulation adopted pursuant thereto is governed by the rule or statute applicable to the court in which the action is brought, unless the action is brought by a public agency or political subdivision to enforce its own rules, regulations and ordinances in which case no security shall be required.

(k) The agency shall monitor activities in the region and may bring enforcement actions in the region to insure compliance with the regional plan and adopted ordinances, rules, regulations and policies. If it is found that the regional plan, or ordinances, rules, regulations and policies are not being enforced by a local jurisdiction, the agency may bring action in court of competent jurisdiction to insure compliance.

Compliance

(l) Any person who violates any provision of this compact or of any ordinance or regulation of the agency or of any condition of approval imposed by the agency is subject to a civil penalty not to exceed $5,000. Any such person is subject to an additional civil penalty not to exceed $5,000 per day, for each day on which such a violation persists. In imposing the penalties authorized by this subdivision, the court shall consider the nature of the violation and shall impose a greater penalty if it was willful or resulted from gross negligence than if it resulted from inadvertence or simple negligence.

(m) The agency is hereby empowered to initiate, negotiate and participate in contracts and agreements among the local governmental authorities of the region, or any other intergovernmental contracts or agreements authorized by State or Federal law.

Contracts and agreements

(n) Each intergovernmental contract or agreement shall provide for its own finding and staffing, but this shall not preclude financial contributions from the local authorities concerned or from supplementary sources.

(o) Every record of the agency, whether public or not, shall be open for examination to the legislature and controller of the State of California and the legislative auditor of the State of Nevada.

Records

(p) Approval by the agency of any project expires 3 years after the date of final action by the agency or the effective date of the amendments to this compact, whichever is late, unless construction is begun within that time and diligently pursued thereafter, or the use or activity has commenced. In computing the 3-year period any period of time during which the project is the subject of a legal action which delays or renders impossible the diligent pursuit of that project shall not be counted. Any license, permit or certificate issued by the agency which has an expiration date shall be extended by that period of

Project expiration

time during which the project is the subject of such legal action as provided in this subdivision.

(q) The governing body shall maintain a current list of real property known to be available for exchange with the United States or with other owners of real property in order to facilitate exchanges of real property by owners of real property in the region.

<div style="text-align: right">Real property list</div>

<div style="text-align: right">94 STAT. 3249</div>

## ARTICLE VII. – ENVIRONMENTAL IMPACT STATEMENTS

(a) The Tahoe Regional Planning Agency when acting upon matters that have a significant effect on the environment shall:

(1) Utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(2) Prepare and consider a detailed environmental impact statement before deciding to approve or carry out any project. The detailed environmental impact statement shall include the following:

(A) The significant environmental impacts of the proposed project;

(B) Any significant adverse environmental effects which cannot be avoided should the project be implemented;

(C) Alternatives to the proposed project;

(D) Mitigation measures which must be implemented to assure meeting standards of the region;

(E) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity;

F) Any significant irreversible and irretrievable commitments of resources which would be involved in the proposed project should it be implemented; and

(G) The growth-inducing impact of the proposed project;

(3) Study, develop and describe appropriate alternatives to recommended courses of action for any project which involves unresolved conflicts concerning alternative uses of available resources;

(4) Make available to States, counties, municipalities, institutions and individuals, advice and information useful in restoring, maintaining and enhancing the quality of the region's environment; and

(5) Initiate and utilize ecological information in the planning and development of resource-oriented projects.

(b) Prior to completing an environmental impact statement, the agency shall consult with and obtain the comments of any Federal, State or local agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies which are authorized to develop and enforce environmental standards shall be made available to the public and shall accompany the project through the review processes. The public shall be consulted during the environmental impact statement

<div style="text-align: right">Public comments</div>

process and views shall be solicited during a public comment period not to be less than 60 days.

    (c) Any environmental impact statement required pursuant to this article need not repeat in its entirety any information or data which is relevant to such a statement and is a matter of public record or is generally available to the public, such as information contained in an environmental impact report prepared pursuant to the California Environmental Quality Act or a Federal environmental impact statement prepared pursuant to the National Environmental Policy Act of 1969. However, such information or data shall be briefly described in the environmental impact statement and its relationship to the environmental impact statement shall be indicated.
<div style="float:right">Information, repetition<br><br><br>42 USC 4321 note<br><u>94 STAT. 3250</u></div>

    In addition, any person may submit information relative to a proposed project which may be included, in whole or in part, in any environmental impact statement required by this article.

    (d) In addition to the written findings specified by agency ordinance to implement the regional plan, the agency shall make either of the following written findings before approving a project for which an environmental impact statement was prepared:
<div style="float:right">Written findings</div>

        (1) Changes or alterations have been required in or incorporated into such project which avoid or reduce the significant adverse environmental effects to a less significant level; or

        (2) Specific considerations, such as economic, social or technical, make infeasible the mitigation measures or project alternatives discussed in the environmental impact statement on the project.

A separate written finding shall be made for each significant effect identified in the environmental impact statement on the project. All written findings must be supported by substantial evidence in the record.

    (e) The agency may charge and collect a reasonable fee from any person proposing a project subject to the provisions of this compact in order to recover the estimated costs incurred by the agency in preparing an environmental impact statement under this article.
<div style="float:right">Fees</div>

    (f) The agency shall adopt by ordinance a list of classes of projects which the agency has determined will not have a significant effect on the environmental and therefore will be exempt from the requirement for the preparation of an environmental impact statement under this article. Prior to adopting the list, the agency shall make a written finding supported by substantial evidence in the record that each class of projects will not have a significant effect on the environment.
<div style="float:right">Exemptions</div>

## ARTICLE VIII. – FINANCES

    (a) On or before September 30 of each calendar year the agency shall establish the amount of money necessary to support its activities for the next succeeding fiscal year commencing July 1 of the following year. The agency shall apportion $75,000 of this amount among the counties within the region on the same ratio to the total sum required as the full cash valuation of taxable property within the region in each county bears to the total full cash valuation of taxable property within the region. In addition, each county within the region in California shall pay $18,750 to the agency and each county within the region in Nevada, including Carson City, shall pay $12,500 to the agency, from any funds available therefor. The State of California and the State of Nevada may pay to the agency by July 1 of each year any additional sums necessary to support the operations of the agency pursuant to this compact. If additional funds are required, the agency shall make a request for the funds to the States of California and Nevada. Requests for State funds must be apportioned two-third from California and one-third from Nevada. Money appropriated shall be paid within 30 days.

    (b) The agency may fix and collect reasonable fees for any services rendered by it.
<div style="float:right">Fees</div>

(c) The agency shall submit an itemized budget to the States for review with any request for State funds, shall be strictly accountable to any county in the region and States for all funds paid by them to the agency and shall be strictly accountable to all participating bodies for all receipts and disbursement.

Budget

94 STAT. 3251

(d) The agency is authorized to receive gifts, donations, subventions, grants, and other financial aids and funds; but the agency may not own land except as provided in subdivision (i) of article III.

Gifts

(e) The agency shall not obligate itself beyond the moneys due under this article for its support from the several counties and the States for the current fiscal year, plus any moneys on hand or irrevocably pledged to its support from other sources. No obligation contracted by the agency shall bind either of the party States or any political subdivision thereof.

Obligations

## ARTICLE IX. – TRANSPORTATION DISTRICT[2]

(a) The Tahoe transportation district is hereby established as a special purpose district. The boundaries of the district are coterminous with those of the region.

Establishment

(b) The business of the district shall be managed by a board of directors consisting of:

Board of Directors

(1) One member of the county board of supervisors of each of the counties of El Dorado and Placer;

(2) One member of the city council of the city of South Lake Tahoe who must be appointed by the city council;

(3) One member each of the board of county commissioners of Douglas County and of Washoe County who must be appointed by his respective board of county commissioners;

(4) One member of the board of supervisors of Carson City who must be appointed by the board of supervisors;

(5) One member of the South shore Transportation management Association, or its successor organization;

(6) One member of the North Shore Transportation Management Association, or its successor organizations;

(7)  One member appointed by the governing body of the agency;

(8)  One member appointed by a majority of the other voting directors who represents a public or private transportation system operating in the region;

(9)  The director of the California Department of Transportation;

(10) The director of the department of transportation of the State of Nevada.

(11) One member appointed by the Governor of California; and

(12) One member appointed by the Governor of Nevada.

(c) The directors of the California Department of Transportation and the department of transportation of the State of Nevada serve as nonvoting directors, but may attend the meetings of the

Voting

---

[2] Including amendments as set forth in NRS 277.200 and Cal. Gov. Code § 66801

board to provide technical and professional advice to the district.

(d) The board of directors shall elect from its own members a chairman and a vice chairman, whose terms of office shall be 2 years. If a vacancy occurs in either office, the board may fille such vacancy for the unexpired term. A member who is elected to serve as chairman or vice chairman pursuant to this subdivision may be elected to serve a subsequent term as a chairman or vice chairman, as applicable.

(e) The vote of a majority of the directors must agree to take action. If a majority of votes in favor of an action are not cast, an action of rejection shall be deemed to have been taken.

*Powers*

(f) The Tahoe transportation district may by resolution establish procedures for the adoption of its budgets, the appropriation of its money and the carrying on of its other financial activities. These procedures must conform insofar as is practicable to the procedures for financial administration of the State of California or the State of Nevada or one or more of the local governments in the region.

(g)  The Tahoe transportation district may in accordance with the adopted transportation plan:

1) Own and operate a public transportation system to the exclusion of all other publicly owned transportation systems in the region.

(2) Own and operate support facilities for public and private systems of transportation, including, but not limited to, parking lots, terminals, facilities for maintenance, devices for the collection of revenue and other related equipment.

(3) Acquire or agree to operate upon mutually agreeable terms any public transportation system or facility within the region.

(4) Hire the employees of existing public transportation systems that are acquired by the district without loss of benefits to the employees, bargain collectively with employee organizations, and extend pension and other collateral benefits to employees.

(5) Contract with private companies to provide supplementary transportation or provide any of the services needed in operating a system of transportation for the region.

(6) Contract with local governments in the region to operate transportation facilities or provide any of the services necessary to operate a system of transportation for the region.

(7) Fix the rates and charges for transit services provided pursuant this subdivision.

(8) Issue revenue bonds and other evidence of indebtedness. and make other financial arrangements appropriate for developing and operating a public transportation system.

(9) By resolution, determine and propose for adoption a tax for the purpose of obtaining services of the district. The tax proposed must be general and of uniform operation throughout the region, and may not be graduated in any way, except for a sales and use tax. If a sales and use tax is approved by the voters as provided in this paragraph, it may be administered by the states of California and Nevada respectively in accordance with the laws that apply within their respective jurisdictions and must not exceed a rate of 1 percent of the gross receipts from the sale of tangible personal property sold in the district. The district is prohibited from imposing any other tax measured by gross or net receipts on business, an ad valorem tax, a tax or charge that is assessed against people or vehicles as they enter or leave the region, and any tax, direct or indirect, on gaming tables and devices.

*94 STAT. 3252*

Case 2:24-cv-00441-AC   Document 1   Filed 02/09/24   Page 50 of 51

Any such propositions must be submitted to the voters of the district and shall become effective upon approval of two-thirds of the voters voting on the proposition. The revenues from any such tax must be used for the service for which it was imposed, and for no other purpose.

(10) Provide service from inside the region to convenient airport, railroad and interstate bus terminals without regard to the boundaries of the region.

(h) The legislatures of the States of California and Nevada may, by substantively identical elements, amend this article.

Amendment

## ARTICLE X. – MISCELLANEOUS

(a) It is intended that the provisions of this compact shall be reasonably and liberally construed to effectuate the purposes thereof. Except as provided in subdivision (c), the provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any participating State or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of the compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any State participating therein, the compact shall remain in full force and effect as to the remaining State and in full force and effect as to the State affected as to all severable matters.

(b) The agency shall have such additional powers and duties as may hereafter be delegated or imposed upon it from time to time by the action of the legislature of either State concurred in by the legislature of the other.

(c) A State party to this compact may withdraw therefrom by enacting a statue repealing the compact. Notice of withdrawal shall be communicated officially and in writing to the Governor of the other State and to the agency administrators. This provision is not severable, and if it is held to be unconstitutional or invalid, no other provision of this compact shall be binding upon the State of Nevada or the State of California.

Withdrawal

(d) No provision of this compact shall have any effect upon the allocation, distribution or storage or interstate waters or upon any appropriative water right.

Interstate waters

SEC 2. The Secretary of Agriculture and the heads of other appropriate agencies are authorized, upon the request of the Tahoe Regional Planning Agency, to cooperate with the Tahoe Regional Planning Agency in all respects compatible with carrying out the normal duties of their agencies.

Inter-agency cooperation

SEC 3. The consent to the compact by the United States is subject to the condition that the President may appoint a nonvoting representative of the United States to the governing body of the Tahoe Regional Planning Agency.

U.S. Representative

SEC 4. Any additional powers conferred on the agency pursuant to article X, section 1(b) of the compact shall not be exercised unless consented to by the Congress.

SEC 5. Nothing contained in this Act or in the compact consented to shall in any way affect the powers, rights, or obligations of the United States, or the applicability of any law or regulation of the United States in, over or to the region or waters which are the subject of the compact, or in any way affect rights owned or held by or for Indians or Indian tribes subject to the jurisdiction of the United States.

SEC 6. The right is hereby reserved by the Congress or any of its standing committees to require the disclosure and furnishing of such information and data by or concerning the Tahoe Regional Planning

94 STAT. 3253

Agency as is deemed appropriate by the Congress or such committee.

SEC 7. The right to alter, amend, or repeal this Act is hereby expressly reserved.
Approved December 19, 1980

LEGISLATIVE HISTORY
CONGRESSIONAL RECORD, VOL. 126 (1980):
    Dec. 1, considered and passed House
    Dec. 3, considered and passed Senate